**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | : | |
| IN RE: PREMIER AUTOMOTIVE | | |
| SERVICES, INC. | : | |
| | | |
| *   *   *   *   *   *   *   * | : | |
| | | |
| PREMIER AUTOMOTIVE SERVICES, | : | |
| INC. | | |
| | : | Civil Action WMN-06-1733 |
| v. | | Bankr. No. 05-2-0168-JS |
| | : | Adversary No. 05-1378 |
| | | |
| MARYLAND PORT ADMINISTRATION | : | |
|   et al. | | |
| | : | |
| | | |
| *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   * | | |
| | | |
| PREMIER AUTOMOTIVE SERVICES, | : | |
| INC. | | |
| | : | |
| v. | | |
| | : | Civil Action WMN-06-1761 |
| | | |
| ROBERT L. FLANAGAN | : | |
|   et al. | | |
| | : | |

<u>**MEMORANDUM**</u>

Civil Action No. WMN-06-1733 is an appeal from a decision of the United States Bankruptcy Court for the District of Maryland: (1) granting summary judgment in favor of the defendants in Adversary Proceeding No. 05-1378; and (2) granting relief from the automatic bankruptcy stay on grounds of bad faith on the part of the purported debtor, Premier Automotive Services, Inc. (Premier).  In addition to Premier's appeal of the Bankruptcy Court's decision, Appellees Maryland Port Administration (MPA),

an agency of the State of Maryland, and Robert L. Flanagan and F. Brooks Royster, III, its principal directors, have filed a motion to dismiss the bankruptcy petition.  Paper No. 19.  Also to be resolved in Civil Action No. WMN-06-1733 is whether MPA should be held in civil contempt for actions taken by MPA immediately after the Bankruptcy Court issued the ruling that is now being appealed.

Civil Action No. WMN-06-1761 is a separate action filed by Premier under the provisions of the Shipping Act of 1984, as amended, 46 App. U.S.C. § 1701 et seq. (the Shipping Act) against Flanagan and Royster.  This second suit arises out of the identical factual circumstances as the bankruptcy appeal and, thus, the Court will address both actions in this same memorandum.  Pending in Civil Action No. WMN-06-1761 is Defendants' motion to dismiss.  Paper No. 5.

The Court finds that no hearing is necessary as to any of the pending motions and that the decision of the Bankruptcy Court shall be affirmed, MPA's motion to dismiss the bankruptcy action shall be granted, and the motion to dismiss filed by Flanagan and Royster in the Shipping Act case will also be granted.  As for the contempt issue, the Court concludes that it will not find MPA and its counsel in contempt.

## I. FACTUAL AND PROCEDURAL BACKGROUND

These actions arise out of the efforts of Premier and MPA to

2

negotiate a new lease for "Lot 90," a parcel of land of approximately six and one-half acres owned by MPA and located in the Dundalk Marine Terminal.  After these efforts failed to produce a lease that was satisfactory to Premier, Premier has used these legal actions which invoke various federal stay provisions to provide an alternative means to keep Premier in possession of Lot 90 for as long as possible.  Unfortunately, while these actions abound in legal creativity, they generally lack legal merit.

Premier is an import/export vehicle processor.  Although it has engaged in the processing of automobiles in the past, it represents that its current business is focused on processing trucks and heavy military, agricultural, and construction equipment.  Premier has been operating a vehicle processing business on Lot 90 for more than forty years.  It first leased the property in 1964 and, upon entering the lease, built a building on the property (hereinafter, "the Building") which it has owned, occupied, and used since that time to perform its various services.  In addition to Premier's field office, the Building contains a wash line, a body and paint shop, a break room for Premier employees, and an equipment room.

Over the years, Premier has occupied Lot 90 under a number of different leases.  In July of 1992, Premier and the MPA entered into a five year lease, with an option to renew for five

additional years.  Premier exercised that option in 1997 but it
is undisputed that this renewed lease expired on June 30, 2002.
Thereafter, pursuant to a holdover provision in the July 1992
lease, Premier occupied Lot 90 as a month-to-month tenant paying
a monthly rent of 125% of the published tariff.  MPA offered
several proposed long term leases but they were unacceptable to
Premier.  On March 29, 2005, after three years of unsuccessful
negotiations, MPA requested that Premier vacate Lot 90 on or
before May 1, 2005.  MPA also informed Premier that it had leased
Lot 90 to another vehicle processor, Pasha Automotive Services
(Pasha).  Two days before it was to vacate the premises, however,
on April 29, 2005, Premier filed for bankruptcy under Chapter 11,
thus invoking the automatic stay provision of § 362 of the
Bankruptcy Code.

On May 6, 2005, Premier filed an adversary proceeding in the
bankruptcy case against:  MPA; Robert Flanigan, in his official
capacity as Secretary of the Maryland Department of
Transportation; and, M. Kathleen Broadwater, in her official
capacity as Acting Director of MPA.[1]  As subsequently amended,
Premier's complaint asserted claims under three legal theories:

---

[1] Premier subsequently amended its complaint to substitute
F. Brooks Royster, III, in his official capacity as Executive
Director of MPA, in place of Ms. Broadwater.  It also appears
that Premier dropped its direct claims against MPA.  See Second
Amended Compl. ¶ 7.

substantive due process, equal protection, and unlawful taking.[2]
On October 28, 2005, MPA filed a motion for relief from the
automatic stay so that it could retake possession of Lot 90.
After a two-day evidentiary hearing held on December 2 and 8,
2005, Bankruptcy Judge James F. Schneider indicated from the
bench that he would lift the stay and that a written opinion and
order to that effect would issue shortly thereafter.  On December
27, 2005, Defendants moved for summary judgment on the complaint
in the adversary proceeding.  After oral argument held on March
7, 2006, Judge Schneider indicated that this motion would be
granted as well, with a written opinion and order to follow.  On
June 8, 2006, Judge Schneider issued the written opinion and
order memorializing his previous rulings.

Under the Federal Rules of Bankruptcy Procedure, "[a]n order
granting a motion for relief from an automatic stay made in
accordance with Rule 4001(a)(1) is stayed until the expiration of
10 days after the entry of the order, unless the court orders
otherwise."  Fed. R. Bankr. P. 4001(a)(3).  In its motion to
lift the § 362 automatic stay, MPA also requested that the
Bankruptcy Court "order otherwise" and exempt this action from

---

[2] Premier added a fourth claim under 11 U.S.C § 525 which
related to a different lot leased from MPA by Premier, Lot 401.
Premier indicates that this claim was later mooted by MPA's
acquiescence to the relief sought and further represents that
this claim is not germane to these pending actions.  See
Appellant Br. 13 n.4.

the automatic stay of Rule 4001(a)(3).   Judge Schneider's
Memorandum and Order, however, was silent on that issue.   Thus,
MPA remained unable to lawfully evict Premier from Lot 90 for at
least another ten days.

On June 9, 2006, Premier filed this appeal from Judge
Schneider's order of the previous day and also filed a motion for
stay pending appeal pursuant to Rule 8005 of the Bankruptcy
Rules.   On June 12, 2006, the Bankruptcy Court, with the
agreement of counsel, scheduled a hearing for June 19, 2006, on
the motion for stay pending appeal.   On the evening of June 12,
however, police under the direction of MPA broke into and seized
Premier's premises on Lot 90, arresting one of Premier's
employees.   The following day, Premier requested and was granted
an emergency hearing before the Bankruptcy Court regarding the
events of the previous night.   At the hearing, Judge Schneider
was highly critical of MPA for violating Rule 4001(a)(3).[3]   Judge
Schneider then proceeded to consider Premier's motion for a stay
pending appeal and summarily granted same.

In the meantime, a few weeks after Judge Schneider announced
in the December 8, 2005, hearing his intention to lift the
bankruptcy stay, Premier filed a complaint with the Federal
Maritime Commission (FMC) based upon the identical facts that

---

[3] It is based upon MPA's actions on the evening of June 12,
2006, that Premier requests MPA be held in contempt of court.

were presented in the adversary proceeding before the Bankruptcy
Court.  Instead of constitutional claims, however, Premier re-
cast those allegations as claims under the federal Shipping Act.
The defendants in that action, Flanagan and Royster, moved to
dismiss the complaint and FMC Chief Administrative Law Judge
Krantz granted that motion on March 31, 2006.  Judge Krantz found
that the relief requested was inconsistent with principles of
state sovereign immunity.  Premier has appealed that decision to
the FMC, where it remains pending.

Premier then filed its second action in this Court, Civil
Action No. WMN-06-1761, asserting similar claims under the
Shipping Act as those asserted in the FMC complaint.  As relief,
Premier seeks a preliminary injunction pursuant to section
11(h)(2) of the Shipping Act, 46 App. U.S.C. § 1710(h)(2),
enjoining MPA Defendants from evicting Premier from Lot 90
pending final judgment on the appeal before the FMC.[4]  Premier
also seeks a permanent injunction enjoining Defendants from
evicting Premier from Lot 90 "pending conclusion of good faith
negotiations for a new Premier lease at Lot 90."  Prayer for
Relief (B)(2).

**II. DISCUSSION**

---

[4] Section 1710(h)(2) allows a district court upon an
appropriate showing to issue a temporary restraining order or
preliminary injunction for a period not to exceed 10 days after
the FMC has issued an order disposing of the complaint.  App.
U.S.C. § 1710(h)(2).

**A. Sovereign Immunity**

Because resolution of the issue of sovereign immunity under the Eleventh Amendment is potentially dispositive of both the Bankruptcy Case and the Shipping Act Case, it requires a brief discussion.

It is undisputed that MPA is an arm of the State of Maryland and thus, is protected by sovereign immunity from a private suit. See Ceres Terminals Inc. v. Maryland Port Administration, 30 S.R.R. 804 (2004).  To avoid this bar, Premier named Flanagan and Royster as the defendants in the bankruptcy adversary action (as amended) and the Shipping Act case, instead of MPA.  Under the well-established exception to sovereign immunity established in Ex parte Young, 209 U.S. 123 (1908), individuals acting in their official capacity for the State may be sued for prospective injunctive relief.  See Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002) ("The Ex Parte Young exception to Eleventh Amendment . . . allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute.").

Flanagan and Royster, however, argue that both of Premier's actions against them are barred by an exception to the Ex parte Young exception, the contours of which were outlined in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997).  Under the

8

Coeur d'Alene exception to the exception, sovereign immunity bars a suit notwithstanding Ex parte Young when the injunctive relief sought "implicates special sovereignty interests."  521 U.S. at 281. Flanagan and Royster argue that, because the injunction Premier is seeking in both actions is an "attempt to gain an interest in a particular portion of sovereign state land," Shipping Act Case Reply 13, the issuance of the injunction would implicate these special interests and Premier's cases are therefore barred under Coeur d'Alene.

Coeur d'Alene was a suit brought by an Indian Tribe to establish the Tribe's ownership rights to submerged lands within the boundaries of its reservation.  Even though the suit was brought against state officials alleging an ongoing violation of federal law and sought only prospective injunctive relief, the Court held that this was not enough to invoke the Ex parte Young doctrine.  The Court noted, "this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests."  521 U.S. at 281.  Highlighting the uniqueness of the action, the Court recited the broad ramifications of the requested relief:

> [S]ubstantially all benefits of ownership
> and control would shift from the State to the
> Tribe.  This is especially troubling when
> coupled with the far-reaching and invasive
> relief the Tribe seeks, relief with
> consequences going well beyond the typical
> stakes in a real property quiet title action.
> The suit seeks, in effect, a determination

> that the lands in question are not even
> within the regulatory jurisdiction of the
> State.  The requested injunctive relief would
> bar the State's principal officers from
> exercising their governmental powers and
> authority over the disputed lands and waters.
> The suit would diminish, even extinguish, the
> State's control over a vast reach of lands
> and waters long deemed by the State to be an
> integral part of its territory.  To pass this
> off as a judgment causing little or no
> offense to Idaho's sovereign authority and
> its standing in the Union would be to ignore
> the realities of the relief the Tribe
> demands.

521 U.S. at 282.  The Court then reviewed, at length, the unique status of submerged lands under its own precedent, under English common law, and "from ancient doctrines."  521 U.S. at 283-287; see specifically id. at 283 ("State ownership of [lands underlying navigable waters] has been 'considered an essential attribute of sovereignty.'") (quoting Utah Div. Of State Lands v. United States, 482 U.S. 193, 195 (1987)).

The case at bar does not implicate sovereign interests remotely equivalent to those implicated in Coeur d'Alene.  While Maryland might have a special interest in land contiguous to its harbors, Premier is not seeking the kind of control over Lot 90 that was sought in Coeur d'Alene.  Premier's requested relief would not affect Maryland's title to Lot 90, nor its regulatory authority over Lot 90.  At most, Premier is seeking a fixed term lease.  As discussed in more detail below, Premier argues that it is not even asking for a lease, but simply the "fair opportunity to negotiate for a commercially reasonable lease."  Premier Bankr. Br. 28.

None of the cases cited by MPA interpreting <u>Coeur d'Alene</u> support that decision's applicability here.  For example, MPA relies on <u>Ysleta Del Sur Peublo v. Raney</u>, 199 F.3d 281 (5th Cir. 2000).  In <u>Ysleta Del Sur Peublo</u>, an Indian Tribe brought an action to eject state officials from a piece of state owned land. In concluding that the suit was barred by sovereign immunity under <u>Coeur d'Alene</u>, the Fifth Circuit equated the suit as one "attempt[ing] to persuade us to declare [the state's] title null and void."  199 F.3d 286.  In addition to vitiating the state's title in the property at issue, the court also concluded that the requested relief would "significantly alter the State's regulatory control over the Property because the Property will be considered part of an Indian reservation under federal control." <u>Id.</u> at 290.  Here, Premier's requested relief bears no similar impacts.  Other cases cited by the parties rejecting the application of the <u>Coeur d'Alene</u> doctrine stress the limited reach of that doctrine.  <u>See</u>, <u>e.g.</u>, <u>Arnett v. Myers</u>, 281 F.3d 552, 567-68 (6th Cir. 2002) (in action by duck blind owners to enjoin state officials from removing their blinds from a state owned lake, holding that the relief sought "does not begin to approach the far-reaching and invasive relief sought by the Tribe under the particular and special circumstances of <u>Coeur d'Alene</u>, and this court does not read the ruling of <u>Coeur d'Alene</u> to extend to every situation where a state property interest is implicated"); <u>Lipscomb v. Columbus Mun. Separate School Dist.</u>, 269 F.3d 494, 501 (5th Cir. 2001) (characterizing the requested

relief in <u>Coeur d'Alene</u> as relief that would "strip the State of all of its jurisdiction and power over the land" and distinguishing that relief from the declaration sought in the case before it, noting that if that declaration were issued, "Mississippi would retain jurisdiction over the leased lands; indeed, title to the lands would remain in Mississippi.  The State's basic police and taxing power would not be affected."); <u>Elephant Butte Irrigation Dist. V. Dept. of the Interior</u>, 160 F.3d 602, 612 (10th Cir. 1998) (finding no sovereign immunity and opining that the holding of <u>Coeur d'Alene</u> "reflects the extreme and unusual case in which . . . the suit is prohibited because it involves 'particular and special circumstances'").[5]

Accordingly, the Court concludes that neither the Bankruptcy case nor the Shipping Act case is barred by sovereign immunity under the Eleventh Amendment.  The Court must now turn to the merits of each action.

---

[5] As support for its assertion that its claims are not barred by sovereign immunity, Premier also repeatedly harkens back to a decision of the undersigned, <u>Project Life, Inc. v. Glendening</u>, 139 F. Supp. 2d 703 (D. Md. 2001).  That case is inapposite.  <u>Project Life</u> did result in this Court issuing an injunction requiring MPA to enter into a lease with a particular client.  That case is of no assistance to Premier here, however, because <u>Project Life</u> was an action that arose under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131-12134. That statute includes a valid abrogation of sovereign immunity. <u>Id.</u> at 707 n.5.  Furthermore, because the defendants in that action "concede[d] that, under the doctrine of <u>Ex parte Young</u> [] Plaintiff can obtain an injunction for the prospective enforcement of federal law without regard to the validity of the the abrogation of sovereign immunity," <u>id.</u> at n.4, the applicability of the <u>Coeur d'Alene</u> doctrine was never raised nor considered.

**B. The Bankruptcy Case[6]**

It is undisputed that the viability of the constitutional claims asserted in the adversary action is at the crux of Premier's Chapter 11 bankruptcy.[7]  Premier has filed no plan of reorganization, candidly acknowledging that "Premier's plan for reorganization is this litigation."  Premier's Br. 40 (emphasis in original).  Therefore, the Court starts its discussion of the bankruptcy case by examining the merits of Premier's constitutional claims.

**1. Premier's Constitutional Claims**

In Count I of the Second Amended Complaint, Premier asserts a denial of substantive due process.  To succeed on a substantive due process claim, a plaintiff must show that it was arbitrarily and capriciously deprived of a "cognizable property interest, rooted in state law."  Scott v. Greenville County, 716 F.2d 1409, 1418 (4th Cir. 1983).  Property interests protected by due process are neither created nor defined by the Constitution. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure

---

[6] Unless otherwise noted, pleadings referenced in Section B of this Memorandum refer to pleadings filed in Civil Action No. WMN-06-1733.

[7] As Premier observes, "[a]t the end of the day, the question framed in this appeal remains straightforward: has Premier articulated legitimate property interests of a constitutional dimension that warrant protection by the Bankruptcy Court and trial on the merits?"  Premier Reply at 3.

certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  In order for a person to have a property interest in some benefit, "[h]e must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." Id.  Furthermore, substantive due process protects only those interests that are "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325 (1937).  The doctrine of judicial self-restraint requires courts to "exercise the utmost care" when presented with a request to define or develop rights in this area. Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

Count II of the Second Amended Complaint asserts a claim under the Takings Clause of the Fifth Amendment.  This clause prohibits the taking of "private property" "for public use, without just compensation."  This limitation on governmental power has been imposed on the states through the Fourteenth Amendment. See Phillips v. Washington Legal Foundation, 524 U.S. 156, 163 (1998).  Like the Due Process Clause, the Takings Clause protects private property; it does not create it. See Phillips, 524 U.S. at 164.  Thus, in identifying a property interest so protected, we must again look to "traditional rules of property law to determine whether a constitutionally protected property interest exists." Washlefske v. Winston, 234 F.3d 179, 184 (4th Cir. 2000).

In Count III of the Second Amended Complaint, Premier

14

attempts to bring a claim for a violation of the Equal Protection
Clause of the Fourteenth Amendment.  Premier alleges that "under
the guise of its regulatory and management authority," MPA
"intentionally singled out Premier from a group of similarly
situated persons" when it refused to offer Premier a
"commercially fair and reasonable lease."  Am. Compl. ¶¶ 56, 57.
This is a somewhat unusual equal protection claim.  In the
typical claim, the plaintiff alleges ill treatment or denial of
some benefit based upon the plaintiff's membership in some
disfavored class, usually defined by some characteristic such as
race, religion or gender.  By alleging that it was "singled out,"
however, Premier is essentially arguing that it is a "class of
one" that has suffered discriminatory treatment.  The Supreme
Court has expressly recognized "class of one" equal protection
claims.  See Village of Willowbrook v. Olech, 528 U.S. 562 (2000)
(per curiam) ("Our cases have recognized successful equal
protection claims brought by a 'class of one,' where the
plaintiff alleges that she has been intentionally treated
differently from others similarly situated and that there is no
rational basis for the difference in treatment."); see also,
Willis v. Town Of Marshall, 426 F.3d 251, 263 (4th Cir. 2005)
("[The plaintiff's] allegations of arbitrary singling-out by the
Town are sufficient to support an Olech 'class of one' claim.");
Esmail v. Macrane, 53 F.3d 176, 179-80 (7th Cir. 1995) (holding
that "[i]f the power of government is brought to bear on a
harmless individual merely because a powerful state or local

15

official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court" under the Equal Protection Clause even though the individual is not a member of an identifiable group).

It is important to note, however, that when a government classification does not burden the exercise of a fundamental right or disadvantage a member of a suspect class, the government need only show a reasonably conceivable state of facts that could provide a rational basis for the classification.  Board of Tr. v. Garrett, 531 U.S. 356, 367 (2001).  This rational basis review also applies when the government intentionally treats a "class of one" differently than other similarly situated individuals.  See Olech, 528 U.S. at 564.

At least as to the Due Process and Taking Clause claims, the preliminary issue is whether Premier had a constitutionally protected property interest.[8]  The alleged property interests identified in the Second Amended Complaint as giving rise to the Due Process claim include the ownership of the Building and other

---

[8] By intertwining its discussion of the three different constitutional claims, MPA improperly imposed a burden on Premier to identify a "protected property interest" in order to succeed on its equal protection claim.  See MPA Brief at 28 ("Premier had no property interest . . . of which it could have been deprived by denial of substantive due process or equal protection, or by uncompensated taking").  "It is not necessary [, however,] to prove a deprivation of property to establish a violation of the equal protection clause."  Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921, 931 (5th Cir. 1988).  See also Esmail, 53 F.3d 176, 180 (7th Cir. 1995) ("the equal protection clause . . . does not require proof of a deprivation of life, liberty, or property").

improvements on Lot 90, as well as the value and goodwill of
Premier's business.  Second Am. Compl. ¶¶ 35-38.  In support of
its Takings Clause claims, Premier asserts that its "present and
ongoing leasehold interest in Lot 90, as well as the Building and
fixtures on Lot 90" is the property taken.  Id. ¶ 49.  The
factual record, however, does not support the conclusion that
Premier had any legitimate expectation in any of this "property."

The last lease pursuant to which Premier occupied Lot 90
contained a clause that provided, upon the termination of the
lease, or any renewal thereof, the Building would either be
removed by Premier at Premier's expense or, if MPA consents,
would be considered abandoned by Premier and would become the
property of MPA, without the payment of any consideration.[9]

---

[9] Section 4.2 of the 1992 Lease provided:

Any and all buildings, fixtures, machinery equipment or
improvements installed, erected or caused to be erected by
PREMIER upon the leased premises at PREMIER's expense shall be
owned by PREMIER and must be removed by it at its expense upon
the termination of this LEASE or any renewal thereof, or, in the
event that PREMIER requests, in writing, MPA's permission to
leave any and all buildings, fixtures, machinery, equipment or
improvements erected and intact and MPA specifically notifies
PREMIER in writing that MPA specifically allows and agrees that
the buildings, fixtures, machinery, equipment or improvements,
erected by PREMIER may remain in place, PREMIER shall be deemed
to have abandoned all of its property in the buildings or other
fixtures, machinery, equipment or improvements left behind to
MPA.

In the event that MPA does allow and agree that the
buildings, fixtures, machinery, equipment or improvements erected
by PREMIER are to remain intact after the termination date of
this LEASE or any renewal thereof, PREMIER agrees that ownership
of all the aforementioned buildings, fixtures, machinery,
equipment or improvements shall pass to, and be made the property
of MPA, free and clear of all liens and encumbrances, and without

Thus, under the unambiguous terms of the lease, Premier possesses
no property interest in the Building upon the expiration of the
lease.  The record is clear that the renewed lease expired on
June 30, 2002.  While Premier represents that it remains on Lot
90 under a month-to-month "hold-over" provision in the lease,
that representation is also inconsistent with the record.  On
April 30, 2004, after two years of unsuccessful lease
negotiations, MPA sent a letter to Premier stating that Premier
would be put on "overflow status" as of May 15, 2004, if it did
not sign a new lease.  Thus, while Premier may have continued to
make payments, it did so consistent with MPA's scheduled rates
for overflow storage, not pursuant to any lease, hold-over or
otherwise.  Regardless, Premier does not explain how a permissive
holding-over could give rise to a constitutional claim of
entitlement to any ongoing leasehold interest.  Certainly, it
could not.

     In its more recent pleadings, Premier essentially concedes
that it had no protected property interest in the Building or in
any particular leasehold for Lot 90.  Instead, Premier now
identifies the "right to do business" and the "right for fair
negotiations with the state in the leasing of state-owned
property" as the "property rights of a constitutional dimension"
upon which it bases its claims.  Premier Br. at 34.  Premier's
reliance on the "right to do business" as its protected property
right is somewhat of a red herring.  Premier is certainly

the payment of any consideration whatsoever therefor. . . .

correct, in general terms, that "[t]he right to pursue a lawful business is a constitutionally protected property interest." Premier Br. 30 (quoting Davinci Art Galleries, Ltd. v. New York, 1977 U.S. Dist. LEXIS 16360, *15-16 (S.D.N.Y 1977)).  What Premier is actually asserting, however, is that it has a right to do business on Lot 90.  Throughout its pleadings, Premier strenuously argues that the Building and the facilities therein are essential to its business.  Premier Br. 5 ("Simply stated, Premier could not provide full services to its customers at the Terminal, much less compete for new business, without the critical facilities [located in the Building on Lot 90]."), 44 (arguing that if Premier was forced to move from Lot 90, "it would destroy Premier's business because Premier needs its building to operate").  In fact, the only means Premier identifies by which MPA is alleged to be depriving it of the right to do business is by not granting Premier a new lease for Lot 90.  But, as stated above, under the terms of the lease voluntarily entered into by Premier, Premier has no legitimate entitlement to a new lease for Lot 90, or any continued ownership interest in the Building.

Thus, the only potential "property interest" remaining that could possibly support Premier's constitutional claims is its purported "right for fair negotiations."  In summarizing the nature of its claims, Premier declares that it "simply seeks an injunction requiring fairness by MPA, a state agency, in the negotiating process for a lease.  Entitlement to fair

negotiations for a successor lease at a state-run port facility
is well within the scope of constitutional protections afforded
to a citizen."  Premier Br. at 25.  Stating its position even
more emphatically, Premier asserts, "[a]ll that Premier asks is
for fairness by a state agency in the negotiating process.  That
is, Premier is not asking for a specific lease, or for that
matter, any lease.  Premier is simply asking that it be afforded
a fair opportunity to negotiate for a commercially reasonable
lease."  Id. at 28; see also, id. at 32 ("even if it has no right
to a particular lease, Premier is constitutionally entitled to be
given a fair opportunity for a lease").

     This Court, however, is not convinced that Maryland law
recognizes an entitlement to good faith and fair dealing in
contract negotiations that rises to constitutional dimensions.
Maryland courts have held that there is an implied duty of good
faith and fair dealing where there is an actual contract.
Wootton Enter., Inc. v. Subaru of America, Inc., 134 F. Supp. 2d
698 (D. Md. 2001).  Notwithstanding that implied duty in existing
contracts, however, this Court, as well as the Fourth Circuit,
has consistently held that there is no separate cause of action
for breach of the duty of good faith and fair dealing.  See
Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190
F. Supp. 2d 785, 794 (D. Md. 2002); Paramount Brokers, Inc. v.
Digital River, Inc., 126 F. Supp. 2d 939, 945 (D. Md. 2000); Abt
Assoc., Inc. v. JHPIEGO Corp., 104 F. Supp. 2d 523, 534 (D. Md.
2000); Baker v. Sun Co. (R & M), 985 F. Supp. 609, 610 (D. Md.

1997); <u>Howard Oaks, Inc. v. Md. Nat'l Bank</u>, 810 F. Supp. 674, 677
(D. Md. 1993); <u>Marland v. Safeway, Inc.</u> 65 Fed. Appx. 442, 449
(4th Cir. 2003) ( "We agree with the weight of this authority
that no independent cause of action of this type is recognized in
Maryland.").  If Maryland courts so limit the means to enforce an
obligation for good faith and fair dealing where there is an
existing contract, any claim of entitlement to good faith in the
negotiation of a future contract is even more attenuated.

While neither party nor the Court's own research has
identified a decision under Maryland law reaching the precise
issue of whether the right to fair negotiations is a
constitutionally protected property interest, this Court notes
that numerous courts applying similar law from other states have
found that it is not.  For example, in <u>Stone Mountain Game Ranch,
Inc. v. Hunt</u>, 746 F.2d 761 (11th Cir. 1984), a corporation
operated an animal attraction on land leased in a state park.
After the association that operated the state park refused to
renew the corporation's twenty year lease or to purchase the
corporation's business, the corporation brought a § 1983 action
against the association.  Looking to Georgia property law to
determine if the corporation had a protected property interest,
the Eleventh Circuit concluded that it had no such interest.

> In contemplating whether to renew a lease, a
> landlord has the right to bargain for the
> best possible rent, and terms, it can obtain.
> (Here, the individual defendants had a
> fiduciary duty to their corporate employer to
> do so.)  The landlord should, of course,
> expect the tenant to do likewise.  If it
> fails to negotiate a favorable renewal, the

> landlord has the absolute right to get its
> property back when the lease expires.  The
> tenant, on the other hand, has the right not
> to renew.  If it desires not to renew, or if,
> as here, it wishes to renew but is unable to
> negotiate a deal, the tenant has an
> obligation to quit the premises and should
> expect the landlord to enforce that
> obligation.  In sum, the tenant has no
> property right when renewal negotiations fail.

746 F.2d at 764.  The court also held that "[t]he tenant has no

property interest in having the landlord purchase its business."

Id. at 765.  Furthermore, and of particular significance to the

case at bar, the court reached these conclusions even though the

complaint contained allegations that "the defendants

intentionally delayed negotiations, and ascribe[d] to [the

association's agents] an array of ill will, bad motives, and

tortious conduct including fraud, deceit, and misrepresentation."

Id. at 765-66; see also, Waltentas v. Lipper, 636 F. Supp. 331,

335 (S.D.N.Y. 1986) ("The right to good faith negotiation is a

contract right, not a property interest."), aff'd, 862 F.2d 414,

419 n.1 (2nd Cir. 1988) (agreeing with the district court that

the implied obligation of good faith and fair dealing "'is a

contract right, not a property interest,' and thus not entitled

to section 1983 protection.").

The primary decision upon which Premier relies as support

for its constitutional claims is Baltimore Import Car Serv. &

Storage, Inc. v. MPA, 265 A.2d 866 (Md. 1970).[10]  In Baltimore

---

[10] Because this case was analyzed under the Equal Protection
Clause, the court did not need to determine whether the plaintiff
had identified a protected property interest.  See, supra, n. 8.

<u>Import</u>, the plaintiff, an automobile importer, complained that
the Maryland Port Authority [the Authority][11] was refusing to
lease it land at the terminal because of an exclusive contract
that the Authority had entered into with the plaintiff's
competitor.  On preliminary motions, the trial court granted
judgment for the Authority.  In reversing that decision, the
Maryland Court of Appeals held that "the facts alleged in
Baltimore Import's petition, if supported by competent evidence
and not justified by the Authority, might well establish a course
of conduct so repugnant to fair dealing as to entitle the
petitioner to relief.  The Authority's unexplained refusal to
lease to Baltimore Import may well involve the denial of equal
protection guaranteed by the Fourteenth Amendment . . . ."  265
A.2d 870.  The Court of Appeals opined that it was "not so much
the exclusivity, but the somewhat unusual economics of the
arrangement between the Authority and [the plaintiff's
competition] which may well merit examination."  <u>Id.</u>  Those
"unusual economics" included contract provisions whereby the
competitor received "each year from the Authority for performing
routine services more than twice the amount [the competitor]
pay[s] the Authority in rent."  <u>Id.</u>  The plaintiff also alleged
that its competitor violated Maryland's conflict of interest
statute when it entered into its lease while an agent of the
Authority.  265 A.2d at 870-71.

    Unlike the Maryland Court of Appeals when it reviewed the

----

[11] The Maryland Port Authority is the former name for MPA.

lower court's decision in <u>Baltimore Imports</u>, this Court reviews
the decision of the Bankruptcy Court under a much more developed
evidentiary record.  That record, including documents submitted
by Premier with its complaint, suggests no similar "course of
conduct repugnant to fair dealing."  In fact, the Court finds no
evidence to undermine the conclusion that, in negotiating with
Premier, MPA was acting in a reasonable manner to advance
legitimate goals, consistent with its legislated purpose.

Premier's two primary complaints with the terms offered by
the MPA relate to the "throughput" and "relocation" provisions
included in the lease.  The proffered lease required Premier to
guarantee that it would process a minimum of 1,700 vehicles per
acre of usable vehicle storage area of the leased premises per
lease year.[12]  If Premier failed to meet that minimum
"throughput," it was liable for penalties on a per-vehicle basis.
The lease also provided that MPA could relocate Premier's
operations, without Premier's consent, to a comparable facility
with similar berth access within the terminal at MPA's sole

---

[12] Premier complains that while a 1,700 vehicle throughput
might be reasonable for a processor of automobiles, it is
unreasonable for a vehicle processor handling trucks and
agricultural and construction equipment given the greater space
per vehicle required in the those operations.  In making its
comparisons with other lessees, Premier initially ignored the
fact that, during the negotiations, MPA offered to reduce the
percentage of leased acreage to which the requirement would
apply.  MPA's April 2004 lease proposal that Premier rejected
applied the 1,700 throughput requirement to only 47% of the
leased acreage, yielding a throughput requirement of only 798
vehicles per total leased acre.  This throughput figure is
significantly less than the allegedly more favorable requirements
offered other tenants.

discretion.

MPA explains that its legislated purpose is "'to increase the waterborne commerce of the ports of this State and, by doing so, benefit the people of this State.'"  MPA Br. at 31 (quoting Md. Code Ann., Transp. § 6-102(c)(1)).  MPA then argues that it is certainly conceivable and rational that, in furtherance of this mission, it would require a substantial vehicle throughput level for leased property and would attempt to retain the flexibility to relocate tenants to accommodate new leasing opportunities.  Most of the leases for other MPA tenants that were submitted by Premier contain similar provisions.  In fact, the lease for Lot 90 that MPA offered to Pasha, which Pasha accepted, contained these same provisions.[13]  The bottom line, however, is that Pasha was willing to enter a long term lease, accepting provisions that are more favorable for MPA than those which were rejected by Premier.  MPA's desire for a long term lease of its property under the most favorable terms that it could obtain is certainly a conceivable basis for its decision and MPA's decision rationally serves its legislated purpose.[14]

---

[13] The only significant difference identified by Premier between the lease offered Premier and the lease accepted by Pasha is that Pasha was given five years to build up its business to the minimum throughput level.  It is not unreasonable, however, for a new tenant to be given time to develop its business.

[14] Premier devotes considerable discussion throughout its pleadings to Pasha's criminal conviction arising out of contracts Pasha had with the Department of Defense.  Pasha was temporarily suspended from doing business with the government.  It seems uncontested, however, that MPA was unaware of this history when it leased Lot 90 to Pasha.  Furthermore, it is undisputed that

For all these reasons, this Court finds that Premier's
constitutional claims are unsupportable.  Accordingly, this Court
concludes that the Bankruptcy Court properly granted summary
judgment for the defendants in the adversary action.  In light of
this conclusion, most of the remaining issues in the bankruptcy
action are rendered moot.  As Premier acknowledges that the
constitutional claims were the only "property" of the bankruptcy
estate, once judgment is entered against Premier on those claims,
there is no longer any property to be protected by the automatic
bankruptcy stay.  Thus, the propriety of the Bankruptcy Court's
decision to lift the stay, for whatever reason, effectively
becomes a moot point.

### 2. Civil Contempt

One issue arising out of the bankruptcy case remains
unresolved: Should MPA be held in civil contempt for its actions
in taking brief repossession of Lot 90 on the night of June 12,
2006?

As mentioned above, when MPA filed its motion for relief
from the automatic bankruptcy stay of § 362, it also requested
that Judge Schneider waive the ten-day stay under Rule 4001(a)(3)
that ordinarily follows any order granting relief from the
automatic stay.  Because Judge Schneider's order of June 8, 2006,

---

Pasha has been in good standing with the federal government since
April 16, 2004.  While Premier argues in the Shipping Act case
that MPA should have favored an "honest, locally-based, long-time
tenant" over "an out-of-state company convicted of multiple
price-fixing felonies," Shipping Act Opp. 10, the fact remains
that Pasha was willing to accept terms that Premier was not.

stated that MPA's motion was granted, without noting any
exceptions or reservations, MPA counsel, Assistant Attorney
General Peter Taliaferro, states that he reasonably believed that
MPA's request for the waiver of the ten-day stay was granted as
well.  Taliaferro then set in motion the plan to take possession
of Lot 90 on the evening of June 12.

Meanwhile, on the morning of June 12, the Bankruptcy Court
telephoned Assistant Attorney General T. Byron Smith to schedule
the hearing on Premier's motion for a stay pending appeal.  When
Smith contacted Taliaferro to inform him of the hearing date,
Taliaferro relayed to Smith his plans to take immediate
possession of Lot 90.  Smith expressed reservations about that
course of conduct, and suggested that Taliaferro take a look at
Rule 4001(a)(3).  While Taliaferro states that he did review the
rule, he nonetheless went forward with the planned repossession
of Lot 90.

Premier is correct that the explanation now offered by MPA
counsel for their conduct leaves open some serious questions,
particularly as to the reasonableness of Taliaferro's decision-
making process.  To proceed with a such a confrontational course
of action in reliance on what he knew was an ambiguous order and
that was against the advice of his co-counsel was, as he now
agrees, imprudent.  The Court is particularly troubled that MPA
went forward with this action immediately after it was contacted
by the Bankruptcy Court to schedule a hearing on Premier's motion
to stay pending appeal.  Counsel certainly knew that the actions

27

planned would effectively moot the issue to be addressed at the
just-scheduled hearing and yet, counsel declined to inform the
Bankruptcy Court of the intended course.

Notwithstanding these significant concerns, the Court
concludes that a finding of contempt is not warranted.  While
undeniably imprudent in hindsight, counsel had an arguable basis
for the conclusions drawn.  Furthermore, it is not clear that
there is any additional remedy to which Premier would be entitled
should the Court find MPA in contempt.  Remedies for civil
contempt are limited to those designed to coerce the offending
party into compliance with the court's orders and rules and to
compensate those who have been harmed by the contemnor's conduct.
 United States v. United Mine Workers, 330 U.S. 258, 304 (1946);
In re Promower, Inc., 74 B.R. 49, 50 (D. Md. 1987).  Civil
contempt remedies are not to be punitive.  In re General Motors
Corp., 61 F.3d 256, 259 (4th Cir. 1995).  Here, there is no need
for a coercive remedy as MPA returned possession of Lot 90 to
Premier within 24 hours.  As to any need for the award of
compensatory damages, it is clear that the net result of MPA's
actions on June 12 was the bestowal of a considerable benefit on
Premier.  MPA's actions triggered an immediate hearing before the
Bankruptcy Judge in which he granted Premier's motion for a stay
pending appeal without Premier having to incur the expense of
briefing the motion or preparing for the hearing.  It is also
clear given the "one-sided" nature of Judge Schneider's decision
granting MPA's motions that, were it not for MPA's imprudent

conduct, Judge Schneider would have denied Premier's motion for a stay at the scheduled June 19 hearing.  Because of MPA's rush to take possession, Premier has enjoyed several months of continued possession of Lot 90 that it would not have otherwise enjoyed. These benefits far outweigh any damages Premier may have suffered because of a one day disruption of its business operations.[15]

Given the history of this litigation, the Court is concerned about next steps.  It is anticipated that Premier will appeal this decision and will also move for a stay pending that appeal. To avoid any confusion and consistent with the automatic stay provision of Rule 62 of the Federal Rules of Civil Procedure, the Court hereby orders that MPA shall take no action to enforce this judgment during the ten days following its entry.

### C. The Shipping Act Case[16]

In the Shipping Act Case, Premier alleges that Flanagan and Royster violated sections 10(d)(1), (3), and (4) of the Shipping Act.  46 App. U.S.C. § 1709(d)(1), (3), and (4).  Section 10(d)(1) makes it unlawful for a "marine terminal operator" to "fail to establish, observe and enforce just and reasonable regulations and policies related to or connected with the receiving, handling, storing or delivering of property."  Id. §

---

[15] Premier also references damages suffered by the employee that was arrested on the night of June 12.  Those damages are damages of the employee, not Premier.

[16] Unless otherwise noted, pleadings referenced in this Section C of this Memorandum refer to pleadings filed in Civil Action No. WMN-06-1761.

1709(d)(1).  Section 10(d)(3), by incorporation of § 10(b)(10),

id. § 1709(b)(10), makes it unlawful for a "marine terminal

operator" to "unreasonably refuse to deal or negotiate."  Id. §

1709(d)(3).  Section 10(d)(4) makes it unlawful for a "marine

terminal operator" to "give any undue or unreasonable preference

or advantage or impose any undue or unreasonable prejudice or

disadvantage with respect to any person."  Id. § 1709(d)(4).

The obvious infirmity of Premier's claims under these

sections of the Shipping Act is that Premier does not, and

cannot, allege that Flanagan and Royster are "marine terminal

operators."  Premier's Complaint does allege, and it is

undisputed that "[t]he MPA is a Marine Terminal Operator as that

term is defined in the Shipping Act, 46 [App. U.S.C.] §§ 1701-

1721 (see 46 [App. U.S.C.] § 1702(14))."[17]  Shipping Act

Complaint ¶ 12.  Premier, however, does not name MPA as a

defendant in its Shipping Act case as Premier concedes that MPA,

as a state agency, enjoys sovereign immunity from such claims.

As to the two defendants that the Shipping Act Complaint does

_____

[17] 46 App. U.S.C. § 1702(14) states that "'marine terminal
operator' means a person engaged in the United States in the
business of furnishing wharfage, dock, warehouse, or other
terminal facilities in connection with a common carrier, or in
connection with a common carrier and a water carrier . . . ."
Although "person" is defined to include "individuals,
corporation, partnerships, and associations existing under or
authorized by the laws of the United States or of a foreign
government," it is undisputed that states and municipalities
operating terminals on the water fronts are "persons" subject to
the provisions of the Shipping Act.  See State of California v.
U.S., 46 F. Supp. 474 (N.D. Cal. 1942).

name, Flanagan and Royster, Premier alleges that Flanagan, in his
capacity as Secretary of the Maryland Department of
Transportation and Chairman of the Maryland Port Commission
"directs the MPA," and that Royster, in his capacity as Executive
Director of the MPA, has "direct authority over its functions."
Id.  The statutory language upon which Premier bases its claims,
however, reaches "marine terminal operators," not directors or
officers of marine terminal operators.

Premier contends, without support of any authority, that
distinguishing between a marine terminal operator and its
directors is "sophistry," as "[e]ntities do not operate
independent of human beings."  Opp. 24.  Far from sophistry,
recognizing legal distinctions between legally recognized
organizations and the individuals who are the officers or
directors of those organizations is something that courts do
everyday.  As Defendants aptly observe, "[c]orporations also do
not operate independently of human beings, yet the law is well
settled that the form of the entity cannot simply be ignored to
allow claims to be stated against its officers absent very
specific 'alter ego' allegations of the type Premier has not, and
cannot, make here."  Reply 11.

The Court notes that foiling Premier's attempt to circumvent
MPA's sovereign immunity by naming MPA's directors as defendants
does not undermine the statutory scheme created by the Shipping
Act.  In a recent Supreme Court case holding that sovereign
immunity bars the FMC from adjudicating a private party's

31

complaint against a state port authority, the Court went on to opine that, despite this immunity, the FMC "remains free to investigate alleged violations of the Shipping Act, either upon its own initiative or upon information supplied by a private party and to institute its own administrative proceeding against a state-run port," and that "private parties remain perfectly free to complain to the Federal Government about unlawful state activity." Federal Maritime Com'n v. South Carolina State Ports Authority ,535 U.S. 743, 768 and 768 n. 19 (2002).  Premier took its complaints to the FMC more than nine months ago and, while the FMC is free to investigate Premier's charges, it apparently has declined to do so.

In opposing the motion to dismiss, Premier makes one additional argument premised on § 11(h)(2) of the Shipping Act. That section provides that "[a]fter filing a complaint with the Commission under subsection (a) of this section, the complainant may file suit in a district court of the United States to enjoin conduct in violation of this chapter.  Upon a showing that standards for granting injunctive relief by courts of equity are met and after notice to the defendant, the court may grant a temporary restraining order or preliminary injunction for a period not to exceed 10 days after the Commission has issued an order disposing of the complaint."  46 App. U.S.C. § 1710(h)(2). Premier seems to argue that, because it has filed a complaint with the FMC and an appeal remains pending there, it is automatically entitled to an injunction from this Court

"maintaining the status quo pending final resolution by the FMC of Premier's complaint before that forum."  Opp. 23.

This argument suffers the same infirmity as Premier's argument on the merits of its underlying Shipping Act claims. Section 11(h)(2) permits a district court to enjoin "conduct in violation of this chapter."  The violative conduct to be enjoined is that of the marine terminal operator, MPA, not its directors. Because of sovereign immunity concerns, this Court cannot enjoin MPA.

The Court believes that this argument fails for another reason worthy of mention.  Section 11(h)(2) allows for the grant of an injunction only "upon a showing that standards for granting injunctive relief by courts of equity are met."  In the Fourth Circuit, this showing would be the same as that required to obtain an injunction under Rule 65 of the Federal Rules of Civil Procedure.  See In re Microsoft Corporation Antitrust Litigation, 333 F.3d 517, 528-529 (4th Cir. 2003) (applying decisions under Rule 65 in reviewing the grant of an injunction under section 16 of the Clayton Act that allows for injunctions "under the same conditions and principles as injunctive relief . . . is granted by courts of equity").  The standard for an injunction under Rule 65 as set out by the Fourth Circuit in Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802 (4th Cir. 1991), and as recently summarized by one of our sister courts, requires:

> First, the moving party must make a "clear
> showing" that it will suffer irreparable harm
> if the court denies its request.  [Direx] at
> 812-13.  Second, if the moving party

establishes irreparable harm, the next step
is "to balance the likelihood of irreparable
harm to the plaintiff from the failure to
grant interim relief against the likelihood
of harm to the defendant from the grant of
such relief." <u>Id.</u> at 812.  Third, if the
balance tips in favor of the moving
party, "a preliminary injunction will be
granted if the plaintiff has raised questions
going to the merits so serious, substantial,
difficult, and doubtful, as to make them fair
ground for litigation and thus more
deliberate investigation." <u>Id.</u> at 813.
However, "if the balance does not tip
decidedly there must be a strong probability
of success on the merits." <u>Id.</u>  Fourth, the
court must evaluate whether the public
interest favors granting preliminary
injunctive relief.  <u>Id.</u> at 814.

<u>Southtech Orthopedics, Inc. v. Dingus</u>, 428 F. Supp. 2d 410, 416

(E.D.N.C. 2006).  Furthermore, the Fourth Circuit has cautioned

that "preliminary injunctions are extraordinary remedies

involving the exercise of very far-reaching power to be granted

only sparingly and in limited circumstances."  <u>MicroStrategy Inc.</u>

<u>v. Motorola, Inc.</u>, 245 F.3d 335, 339 (4th Cir. 2001); <u>see also</u>

<u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982) ("courts

of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of

injunction").

It is against this standard that Premier's stay request

should have been evaluated when Premier first filed suit against

MPA.  Instead, by first filing bankruptcy, Premier was able to

by-pass this review and obtain an automatic stay.  Premier's

strategy is understandable, as it is clear that Premier could not

have obtained the relief it sought had it been put the task of

demonstrating its entitlement to an injunction.  As to the
balance of harms, while Premier perhaps could have made a showing
of harm were it to lose Lot 90,[18] MPA contends that it will lose
a tenant willing to sign a long term lease for Lot 90 if there is
much further delay.  For all of the reasons stated above, Premier
can make no showing of likelihood of success on the merits.
Finally, the public interest inherent in MPA's legislated mandate
to increase waterborne commerce of the ports seems best served by
allowing MPA to sign a long-term lease with a tenant willing to
commit to terms most favorable to MPA.

### III. CONCLUSION

For all of the above stated reasons, this Court concludes
that the decisions of the Bankruptcy Court, as memorialized in
Judge Schneider's June 8, 2006, Memorandum and Order, shall be
affirmed, MPA's motion to dismiss the bankruptcy action shall be
granted, and the motion to dismiss filed by Flanagan and Royster
in the Shipping Act case will also be granted.  In addition, the

---

[18] Whether Premier could make a "clear showing" of
irreparable harm is less certain.  There is evidence in the
record casting some doubt as to the singular importance of Lot 90
to Premier's operations.  See Reply Ex. 1, Feb. 17, 2005 Letter
from Premier to MPA ("Clearance and design issues make [Premier's
building on Lot 401] the only viable option for Premier to
process RORO equipment, i.e., Case New Holland, McCormick
Tractor, Buhler and Hino Diesel Trucks (U.S.A.), Inc., which
constitutes most of our business.").

Court concludes that it will not find MPA and its counsel in contempt for the actions of June 12, 2006.  A separate order consistent with this memorandum will issue.


_____
                                   /s/
_____
William M. Nickerson
Senior United States District Judge

DATED:  October 31, 2006